The next case called for oral argument is Peoples v. Woodhall Good afternoon. My name is Andrew Flynn, and I represent the defendant, Allen Daniel Woodhall, in this matter. On October 17, 2012, Wednesday night at approximately 9.20 p.m., three Southern Illinois Enforcement Group agents, or SIG agents, approached the home of the defendant's appellant, Mr. Daniel Woodhall. Six other agents were in vehicles outside of the home. The agents stated purpose there was for to conduct a knock and talk. At that time, the three agents knocked on the door, and a Ms. Ashley Giffen answered the door in her pajamas. At that time, agents requested permission to come into the home, and consent to enter the home is in dispute at this time. The answer is in dispute. It is in dispute. Ms. Giffen testified that she did not give consent. The agents, all three, testified that she did give consent to enter. At any rate, the three agents entered the entrance of the home. Now, the court has held, and this case law is clear, that during a knock and talk, officers will have the same rights as any other individual knocking on a person's home. In this case, of course, there was no search warrant, hence the knock and talk. In considering the believability of the witnesses, or the credibility of the witnesses, the circuit court held, and the plaintiff has argued, that Ms. Giffen's testimony was uncredible. Their argument, if you look at it from a common sense point of view, is that she said, no one else is here, but come on into the house. So once the agents are in the house, they, with a knock and talk, they are able to stay in any invited place, any place they're in. In this case, pursuant to the plaintiff, they were invited in the front entryway of the home, the foyer area. From there, it's admitted that the agents spread around the living room area of the house. And from there, the agents testified that they saw into a person laying in a bedroom. Because they saw into the person laying in the bedroom, and Ms. Giffen had already said, no one else is here, one of the agents admittedly drew his weapon, had the person in the bedroom come out, raise his hands, and they handcuffed that individual and placed him on the couch. Again, going back to the credibility of the witnesses, again, the plaintiff's version of what happened would have Ms. Giffen say, no one's here, come on in, and stand where you can see someone is here. Again, so the officers are here for a knock and talk. They allegedly hear some noise, draw a weapon, have someone come out, handcuff that person, put him on the couch. From there, the officers turn to what their argument is, a protective sweep. Now, a protective sweep is justified when the officers can state specific and articulable facts that someone else in the area may pose a threat or a danger to the officer's safety. Now, in this case, the plaintiff's sole argument to justify a protective sweep is that Ms. Giffen lied and said no one else was in the residence. There's no other fact or evidence that was presented in court or in the record that gives a reason for the justification for a protective sweep. But the trial court believed that she let them in. The trial court held that she let them in. Yes, that's what they held. Again, I know that's kind of one of the smaller issues, there's several issues in this case. Well, it's just one of the facts he found, the trial court found. Yeah, the trial court found that she had let them in. But the court also found that her credibility was in question because of the fact that she said, and the court believed that she said, that there was no one else in the house. Yeah, the court held that she was not a credible witness, and the reason in the court's order was because she lied and said no one else was in the house. The court didn't mention in its order that Ms. Giffen in court stated, yeah, I said no one else was here. There was three men I failed to mention were all wearing plain clothing. They were not in uniform, at her door at 920 p.m. asking to see her, Mr. Woodhull, who was her boyfriend. She said no one else was here. Her testimony in court was, I didn't know who they were. I thought they might be there to beat them up. Again, the court found her to be an uncredible witness. They weren't in uniform, but they did have identification on them, I thought I read. Ms. Giffen said she never saw any badges. All three agents said they were wearing badges. Okay. I think one testified that he was wearing the necklace style. Another one, I think, said he had it on his belt. But there's another discrepancy in the testimony. But again, in looking as far as credibility of witnesses go, the plaintiff's version, as well as the judge's findings, have Ms. Giffen saying, no one's here. Come on in. You can see someone's there. So that's just one aspect of the case. But going on there, it's stated that the only reason they were there for a knockout was for a knockout talk. And as soon as they found out that Ms. Giffen was lying because they saw a third party, Mr. Dakota Graves, not a party in this case. He just happened to be one of their roommates. Because they saw him, they immediately switched to protective suite. But didn't they also see a car that they thought had just come in from the rain or something? There was one car that they testified that had raindrops in the garage. The agents testified that from the initial entryway of the knock and talk parameters, they saw through a garage window that a car was in the garage with raindrops. So that was part of their testimony. There was one car, one person in the house at this time. There was not multiple vehicles. There was one vehicle at the home with Ms. Giffen answering the door at that time. So from there, they switched to the protective suite. Again, there's no statement other than this alleged lie. And then they ask again, is anyone else here? This is after Mr. Graves is handcuffed behind his back, sitting on the couch. I'm not sure, for officer safety. They ask if anyone else is here. Again, Ms. Giffen says no, no one else is here. At that time, the defendant steps out and they see someone else is here. Another officer drops his weapon at the defendant. The order's in this way. At court, does she say that she's still denied that there was anybody else in the house? Yes. And she's still afraid for her safety because she thinks that they're not police officers, but they're there to beat up her boyfriend. At this point, I don't believe she said she was scared. I might have the time frame wrong, but I know after Mr. Graves came out, she said, Mr. Woodhall's not here. Okay. And so from there, a fourth agent entered the house. Now, it's undisputed that it was Agent Gill that no one, not even Ms. Giffen, ever gave this agent permission to enter the house at any time. Mr. Gill enters the house and approaches a door that allegedly has light coming from it. He starts to open the door. The defendant says, no, show me your search warrant. Agent Gill pushes the defendant away, and this is all undisputed, opens the door, and that's where he finds drunk cannabis. From there, all three of the individuals, Mr. Graves, Ms. Giffen, and Mr. Woodhall, are all handcuffed, placed on the couch while the officers conduct a protective search, continue to conduct a protective search. It's undisputed that they were conducting a protective search before. So in going back a little bit to see was this protective, excuse me, protective sweep, not search, and seeing whether this protective sweep was justified, again, the case law is clear that it justified on a reasonable suspicion based on specific and articulable facts that a person may be present in the area and posing a danger to officer safety. Now, the case law also states that mere suspicion alone that someone might be there is not enough for a protective sweep. Further, just because a house may be large enough to hold other people, again, it's not enough for a protective sweep. In cases where the courts have found that a protective sweep was justified are cases where the officer knocks on the door and immediately smells the odor of cannabis or another drug. The officers have seen multiple people, literally seen them already in the house, and they're saying no one's there. Cases where the defendant is known to have committed violent crimes with weapons or the officers actually see weapons in the house. I think one of the officers did say that he, I can't remember the names, but the man he saw in the bedroom, that he had his hands under the cover and he was concerned that perhaps he had a gun or a weapon. In that case, I believe it was Officer Dwyer or Agent Dwyer said he saw someone in this bedroom with his hands under the covers, ordered him out with a weapon. There was no weapon. There's another dispute that goes to credibility of witnesses. Ms. Giffen testified that that door was closed and Agent Dwyer heard something and opened it, which would have begun the protective sweep, whether it was open or closed. Again, if you look at the credibility of witnesses, again, this is Ms. Giffen saying, no one's here, come on in, you can see someone right there, or was that door closed? Ms. Giffen testified. And then she continues to say no one's there when we know at least one other person's there. But again, I can find no case law that says a person has to be truthful during a knock and talk. No, it may not have to be truthful, but it does affect their credibility. Absolutely. But in court, Ms. Giffen was completely honest and told exactly what happened. Yes, I told the officers no one was there. Yes, this is exactly what happened. So you're saying that because she admitted that she lied, then that enhanced her credibility at court? I think it's twofold, Your Honor. I think, one, it admits that I think she was being truthful about the scenario, and, two, it shows this gets into a little bit more of your answer. If you look at what the officer's testimony was, theirs wasn't consistent at all about what happened that night. So I think if you look at both of those, it shows that Ms. Giffen's clearly, her testimony was clearly more credible. Thank you, counsel. Thank you. Good afternoon, Your Honor. This is the court. Counsel. With respect to credibility, the standard is pretty well established in terms of determining the credibility of the witnesses that this court gives considerable deference to the lower court in making those determinations. There's no doubt, and I certainly agree with counsel, that there were some radically different set of facts presented by Ms. Giffen and by the defendant versus the police officer's testimony. Really starting out with the initial encounter, I believe Ms. Giffen had testified to the officers and more or less barged into the house rather than asking for permission to enter or seeking permission to enter to continue the conversation. But I think that the bottom line is that apart now perhaps from the fact that Ashley Giffen was an admitted liar, which I do think the court could take into consideration, I do think that the more important consideration is that the circuit court on this court sat at the hearing, watched the witnesses testify, could assess their credibility based upon their demeanor, the way they testified, and things that the circuit court was in the unique position to make those determinations that this court is not. And so it has to be manifestly apparent from the record that the credibility determination of the court with regards to its belief of the officer's testimony over Ashley Giffen's and the defendant's was erroneous. I don't believe that such a finding can be made from this record. Yes, the officer's testimony did vary a little bit in some minor details, and that's not something that's uncommon. But the court found that overall, found that the officer's version of events was highly credible. And so I'm going to proceed from this point with the state's version of the facts. Interesting when I listen to the defendant's argument that we can kind of take sort of the same set of facts, but they get kind of spun a little bit differently, and I think that the context of it makes a big difference in determining the propriety of the officer's actions in conducting a protective sweep in the situation. In this case, the officers that arrived, there were nine officers that had arrived, six stayed in a vehicle, three approached the doorway, knocked on the door. Ms. Giffen answered. They were asking to speak with the defendant, and they were at that point conducting a drug investigation. They asked if they could enter into the residence, and according to the officers, she agreed. And so they entered. The defendant's correct. When they came in, they sort of positioned themselves in kind of a separate stance, and that just sort of makes sense in order to keep a perspective with things going on. And they did not enter any portion of the interior of the residence in which they had not already been granted permission to do so. So there's no search going on at this point. At this point, an interaction is still going on with Ms. Giffen. Ms. Giffen then basically was asked to speak with the defendant, and she indicated that he was not there and that, in fact, no one else was in the residence at the time, although the officers could see the defendant's vehicle and recognize the defendant's vehicle in the garage with fresh water droplets on it and had been misting outside. So the inference from the officer's perspective is that the vehicle had just come into the garage. Now, she was asked about that, and she indicated to the officers that, well, they had traded cars for the evening. So she sort of persisted in this theme that the defendant was not there. After having been given that assurance that no one was there, and so therefore they believe that they're just the three of them, plus Ms. Giffen speaking, one of the officers, Dwyer, I believe, as the defendant knows, was positioned next to the living room and was adjacent to a bedroom where he saw some ruffling going on and a person moving, flashed a light there and saw the individual, Dakota Graves, who was under the bed, in the bed with the hands under the covers, having been led to believe that there's no one else in the residence, the officer, I think reasonably under circumstances, drew his weapon, ordered him to basically remove his hands, come out, and I believe they placed him in the handcuffs. Now, the record in this case is clear that all this first of all happened in a very short span of time period, around a couple of minutes, okay? So I think when this court sort of mentally visualizes these circumstances here, it has to understand that once this happens, things get very chaotic. The testimony was, I think, by everyone's agreement, that it became very antagonistic, voices were raised, it became very loud, and the officers obviously were concerned at this point about what was happening in this home after having been led to believe that no one was there, and they asked her again, is there anyone else in this residence? Okay, now, let's think about the context of that for a second, okay? A person had been spotted in the bedroom. He was brought out of gunfight, put in the handcuffs, put on the couch. So we have a highly, highly aggravated situation from an emotional standpoint, and the officers put to Ms. Giffen again, is there anyone else in this residence? And she again says, no, there's nobody here. So everyone sort of jumped up at this point. Well, what happens? The defendant walks out of the bedroom where he's at. He comes in on their own. There was not entirely a lot of consistency in the testimony with regards to whether a gun was pointed at the defendant or not. Let's assume, for the sake of argument, that that's true, since a gun was obviously drawn with regards to Mr. Graves. At that point, the officers have gone from a real, you know, volatile situation, if you will, to something that's particularly concerning to them, because now they've been twice lied to, and they have no way of knowing who else is in that residence now. So they're for a drug investigation. They've been purposely lied to twice. They're in a very chaotic situation. Guns have been drawn. And the defendant, excuse me, Ms. Giffen, continues to lie to these police officers. Now, this is a set of facts that was before the circuit court. So the question then comes from the circuit court's perspective. Well, you know, under these circumstances, would an officer have a reasonable belief that someone else may be in this residence that might pose a danger to them? Under all the circumstances, I think that that belief is certainly warranted. Now, the defendant makes the argument sort of in a more calmer fashion, if you will, by saying, well, the state's position is that if you lie, the police are given the right to conduct a protective sweep of the residence. That's not exactly where our position is. Our position is that under the totality of the circumstances, Ms. Giffen's repeated lies, given the emotional context of the situation, would certainly put any reasonable police officer in a position to be highly concerned about the state of their safety, particularly when they're for a drug investigation. Okay? So they don't know what's going on. They certainly know that they're being continued to lie to them after a gun had already been drawn during the course of the encounter, that they don't know what else is going on. And I think that from a constitutional standpoint, that the brief sweep of the home to ensure that there's no one else there, because certainly there's no other way to be certain of that, because they're just being lied to anytime the question comes up, was reasonable under the circumstances from a dangerousness standpoint. And this is just a real-life proposition. These are officers, again, in a very short time span. All this is happening. They don't know what the status of their safety is at that juncture. So I think that the circuit court's determination from a legal standpoint and from a factual standpoint was absolutely correct that the court, excuse me, that the officers conducting them in a protected sweep under those circumstances was justifiable. Their testimony was that they did no search at that point, and that search had not been conducted until after the defendant had given consent to the search. Now, again, we're getting into one of those things where the defendant's counsel is going to rightly argue that that's a contested point. What's not contested, at least, is the fact that the defendant agreed that he had signed a consent to search and he did so, you know, knowing what he was signing. He sort of backtracked and hid it by saying, well, I was a bit scared, although he didn't give the explanation why he was scared. But, again, that's a credible determination for the circuit court where, at this point, where the defendant had been led to a separate bedroom, was handed a consent to search form that was explained to him, he signed it, there were no guns drawn at that point. It may have been the initial encounter, but at that point he wasn't under any sort of overt duress, apart from obviously being, well, I'm going to call him under arrest. I'm going to be perfectly frank with you, Your Honors. There was testimony by the officers, and the court made some sort of indication in the factual findings that the officer said he was not under arrest at that point. But let's be realistic. He was in handcuffs after drugs had been found in the house, and he was carried off to the bedroom to be asked to give a consent. But, of course, there was a probable cause for arrest, because they found drugs. Again, once the officers had had a right to do the protective suite, opening of that closet door, they had a light coming out from under it, under circumstances which they didn't know if anybody else was in the house, but certainly had a reason to think that probably not being was a justifiable action on their part. Plain view doctrine, cannabis is found. At that point, everybody in the house can be arrested for essentially possession of marijuana. So whether or not the defendant was under arrest or not, the point of the matter is that the consent under the totality of circumstances was voluntarily given. The court's findings in that factual regard, I believe, are supported by the record. And I believe that covers pretty much everything. There was some argument with regards to whether the defendant validly waived marijuana, which is an odd argument, because there was really no discussion about any interrogation that took place as to what inculpatory evidence the defendant gave. But the defendant did not expressly contest the Miranda findings at the evidentiary hearing. So I think that the court's findings in its written order with regards to Miranda are also supported by the record. Do your honors have any questions? I don't believe so. I appreciate your time, your honor. Thank you. Thank you, counsel. Oops. Counsel? Just briefly wanted to touch on the chaotic atmosphere that counsel presented. There is no evidence of that whatsoever in the record, that it was chaotic at all. In fact, Agent Hoffman testified it was quiet the entire time. So he's painting a picture of it being a real chaotic situation, people hopping out. No, the testimony and evidence that was reflected in court was 9-20 at night on a Wednesday evening, Ashley Giffen answers the door in her pajamas, three officers come in, see someone laying in their bed allegedly, laying in their bed with the light off, pulls a weapon, get out there, handcuffs him. We don't know why. Agent Gill comes in, no permission there, starts opening other doors. There was evidence that he saw a light coming out the window. There was evidence that he saw a light coming out of that door, yes. But there's no evidence to reflect that it was a chaotic situation at all. And if it did become chaotic, I submit that it was the officers making it chaotic, bringing people in. Before the end of the night, it's undisputed that all nine agents were in the house. Again, no search warrant. They wanted to avoid all this. If they're in a drug investigation, a search warrant could have easily been obtained and this wouldn't have been a problem. So if you look at the totality of the circumstances, you have a young girl answering the door in her pajamas, three officers coming in, drawing their weapons multiple times, handcuffing people, all before the drugs were found, making them stay out on the couch. So there's no reason. There was never any weapons found. There was never any odor, drugs. There was nothing other than Ms. Giffen's lie that would have given any reasonable suspicion whatsoever to justify a protective sweep. And without that protective sweep, we wouldn't be here. Now, just briefly into the consent that was brought up, and I apologize I didn't get to it sooner, just looking at the factors that require consent. Weapons were drawn. They'd been handcuffed for a while. In fact, they moved Mr. Woodhull's handcuffs from behind his back to his front so he could sign them to consent while he was handcuffed. And, again, Mr. Woodhull testified that they had already searched everything before I even got the consent. So I just wanted to make those clarifications. Do you have any additional questions for me? I don't think so, sir. Thank you. We appreciate the views and arguments of counsel. We'll take the case under advisement. Thank you.